## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SONYA HOFFMANN,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **WELLS FARGO BANK, N.A., d/b/a Wells** | : | **CIVIL ACTION** |
| **Fargo Home Mortgage,** | : | **No. 16-4230** |
| **PHELAN HALLINAN DIAMOND & JONES,** | : | |
| **LLP,** | : | |
| **FLASTER/GREENBERG, PC, and** | : | |
| **KENNETH S. GOODKIND, ESQ.,** | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                               **March 16, 2017**

### MEMORANDUM

In 2012, Wells Fargo brought a mortgage foreclosure action against Sonya Hoffmann, but lost following a bench trial.  In 2016, it sued her again on the same debt, prompting Hoffmann to file the present action, in which she charges (for a second time) that Wells Fargo and its lawyers violated various consumer protection laws.  Before me now are Motions to Dismiss filed by Wells Fargo and its co-defendants.  The main issue is whether the verdict in Hoffmann's favor in the 2012 foreclosure action had a claim preclusive effect that would render subsequent attempts to collect on the debt unlawful.  Because I find that Wells Fargo had a colorable, albeit uncertain, legal basis for bringing the second foreclosure action, and because the defendants in this case refrained from abusive, oppressive, or unconscionable conduct in their attempts at debt collection, all but two of Hoffmann's claims fail.

## I.    BACKGROUND

### A.  Prior Litigation and Pending Foreclosure Action

In August, 1998, Plaintiff Sonya Hoffmann borrowed $39,784 from Avstar Mortgage to purchase a house in Darby, Pennsylvania.  Accordingly, she executed a promissory note (Note) and a mortgage (Mortgage) to Avstar, its successors and assigns.  Over the next twelve-odd years, the Mortgage and Note frequently changed hands, until, after at least five assignments, it came into the possession of Defendant Wells Fargo.

Hoffmann's legal troubles with Wells Fargo date back to May 2012, when Wells Fargo accelerated her outstanding debt and brought a foreclosure action against her in Pennsylvania state court seeking recovery of $33,076.30 (2012 Foreclosure).  During the 2012 Foreclosure trial, Wells Fargo's counsel, Defendant Phelan Hallinan Diamond & Jones (PHDJ), revealed for the first time that the previous holders of Hoffmann's mortgage had made two unrecorded assignments of that instrument to the Government National Mortgage Associations (Ginnie Mae).  This revelation led Hoffmann in 2013 to sue Wells Fargo and PHDJ in federal court.  There, she argued that the unrecorded assignments to Ginnie Mae deprived Wells Fargo of valid title to the Mortgage and that Wells Fargo and PHDJ's attempt to foreclose therefore violated the Fair Debt Collection Practices Act (FDCPA) and the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL).[1]

In March 2013, while Hoffmann's federal suit was pending, the state court resolved the 2012 Foreclosure in her favor.  However, the court's decision was based on Wells Fargo's failure to satisfy its evidentiary burden by producing a witness at trial who could authenticate the Note—a holding that shed no light on the legal significance of the unrecorded assignments to Ginnie Mae. The federal action therefore moved forward.

---

[1] The earlier federal suit, *Hoffmann v. Wells Fargo Bank*, No. 13-cv-5700, was originally assigned to Judge Dalzell.  It was reassigned to me on May 30, 2014.

By late 2015, the case had proceeded to discovery and PHDJ had retained Kenneth

Goodkind, and his firm, Flaster/Greenberg.  In preparing PHDJ's defense, Goodkind deposed

Hoffmann on November 13, 2015.  During her deposition testimony, Hoffmann told Goodkind that

she was working to connect buyers and sellers of Treaty of Versailles—or "Versailles"—Bonds.[2]

When Goodkind pressed for details, Hoffmann revealed that she would soon receive "over

$100,000" for her brokerage services.  This prompted the following exchange:

> Q.    Do you have any plans for that money?
>        Mr. Pearson [(Hoffmann's counsel)]: Objection, beyond the scope of
>        discovery.
> Q.    You can answer.
> A.    Yeah, to pay my bills.
>        Mr. Pearson: Objection.
> Q.    Do you intend to pay your mortgage arrears?
> A.    Yes.
> Q.    Have you notified Wells about that?
> A.    No.
> Q.    Have you notified anybody on the lender's side or Phelan about that?
> A.    No.
> Q.    And this could happen as soon as --- it could happen this year?
> A.    Yes.

Am. Compl. Ex. 12 at *20.[3]

By January 2016, having heard nothing more from Hoffmann regarding her Versailles Bond

income, Goodkind sent an e-mail to Hoffmann's lawyer, David Pearson.  Under the heading

"PRIVILEGED AND CONFIDNETIAL SETTLEMENT COMMUNICATION," Goodkind wrote:

> Your client mentioned at her deposition that she anticipated receiving a six figure
> payment around the start of the new year from the Treaty of Versailles bond work
> she does, and that she would be able to use those funds to cure her defaults . . .
> Please . . . let me know what she is willing to offer in settlement.

---

[2] The sale of Treaty of Versailles Bonds, purportedly worth trillions of dollars, appears to be a fairly common form of "fictitious instrument fraud."  Rachel Donadio, *Brother, Can You Spare $6 Trillion?*, N.Y. TIMES, Feb. 17, 2012 (http://www.nytimes.com/2012/02/18/world/europe/italy-arrests-8-in-fake-us-treasury-bonds-scam.html).

[3] Plaintiff's exhibits are not labeled in a consistent fashion.  I therefore refer to the exhibits attached to her Amended Complaint by reference to the numbers assigned them by ECF.

Am. Compl. Ex. 3 at 3.  Pearson responded that "in the typical settlement, the defendant agrees to pay the plaintiff, not the other way around," *id.* at 2, and the matter of Hoffmann's Versailles Bond income eventually was dropped.

 In March 2016, with the 2013 federal action still unresolved but entering its endgame, Wells Fargo sent Hoffmann a letter titled "Notice of Intention to Foreclose" (Notice Letter).  The letter warned that Wells Fargo planned to again initiate foreclosure proceedings unless Hoffmann tendered within 30 days a lump-sum payment of $32,351.63.[4]   When Hoffmann failed to cure her default as directed by the Notice Letter, Wells Fargo made good on its threat.

As in 2012, Wells Fargo retained PHDJ to bring a foreclosure action against Hoffmann. PHDJ began by sending Hoffmann a letter dated April 13, 2016 (Debt Validation Letter).  In that letter, PHDJ explained that it was a debt collector acting on behalf of Wells Fargo, and listed Hoffmann's total outstanding debt as $57,619.91—the sum of her unpaid principal balance and late charges, as well as interest and escrow advances that had been accruing since July 2011.  The letter also warned that unless Hoffmann disputed the validity of her debt, PHDJ would commence an in rem action to foreclose on the Darby property.  It does not appear that Hoffmann submitted any dispute to PHDJ, and the latter filed a foreclosure complaint on April 29, 2016 (2016 Foreclosure).[5]

### B.  Wells Fargo's Monthly Billing Notices and Credit Reporting Practices

Although the 2012 and 2016 Foreclosures sought to recover Hoffmann's entire outstanding principal balance, Wells Fargo continued to send Hoffmann monthly billing notices following the commencement of both actions.  Hoffmann submits one such notice, dated June 16, 2016 (June Notice), as a representative of the set.  The June Notice lists monthly scheduled payments of

---

[4] This amount was the sum of the 56 regularly scheduled monthly mortgage payments that Plaintiff had missed since July 2011, plus $138.19 in late charges and $270 in related fees.

[5] The 2016 Foreclosure was filed in the Delaware County Court of Common Pleas and was assigned to the Hon. G. Michael Green, the same judge who presided over the 2012 Foreclosure.

principal, interest, and escrow advances in the amounts of $130.41, $134.27, and $581.59, respectively.  It further warns that these payments will be added to the "Total payment due 7/01/16," which is listed as $35,466.71.[6]

Consistent with these notices, at all relevant times, it was Wells Fargo's practice to inform Equifax and other Credit Reporting Agencies (CRAs) that Hoffmann had failed each month to tender her scheduled mortgage payment.  The CRAs duly included a record of each missed payment on Hoffmann's credit report.  In early June 2016, Hoffmann sent Equifax a "Request for Research Form," notifying it of a dispute concerning the information on her credit report that had been provided by Wells Fargo.  In a section of the form titled "Reason for Dispute," Hoffmann checked a box labeled "other" and wrote "see attached court ruling," meaning the decision in the 2012 Foreclosure.  The Research Request Form thus made clear that Hoffmann's dispute had something to do with the 2012 Foreclosure, but otherwise offered no insight into the nature of her objections. Nevertheless, Equifax alerted Wells Fargo to the existence of Hoffmann's dispute.  In response, Wells Fargo verified Hoffmann's account information and made a note reflecting the fact that the information that it provided to Equifax was in dispute.  Equifax then sent Hoffmann a report summarizing the resolution of her research request.  Regarding the information provided by Wells Fargo, the report explained:

> We have researched the credit account. . . .  The results are: We verified that this item belongs to you. Additional information has been provided from the original source regarding this item. If you have additional questions about this item please contact: Wells FARGO Home Mortgage, PO Box 10335, DES MOINES IA 50306−0335 Phone: (800) 288−3212

---

[6] The monthly payment and "Total Payment Due" in the June Notice are consistent with the cure amount listed in the Notice Letter.  That letter, which was dated March 2, 2016, informed Plaintiff that she could cure her default by tendering $32,081.63 in past-due payments and late charges, plus $270 in others fees.  The June Notice projects Plaintiff's cure amount as of July 1, 2016, as $35,466.71.  The higher cure amount in the June Notice is attributable to three additional scheduled payments of $846.27 in April, May, and June.  While the June Notice does not reflect the $270 of other fees contained in the Notice Letter, it expressly warns Plaintiff that "[t]he amount to bring the account current may vary daily, call us for a reinstatement or payoff quote."  Am. Compl. Ex. 9.

Am. Compl. Ex. 10.

### C.  The Present Action

Hoffmann's previous federal action finally came to an end on August 2, 2016, when I entered summary judgment for PHDJ on all remaining claims.  With the ink barely dry on that Order, Plaintiff initiated the present action on August 8, 2016.  Plaintiff now argues that the 2012 Foreclosure had a claim preclusive effect that barred subsequent attempts to collect on her debt.  On this theory, she maintains that Goodkind violated various provisions of the FDCPA and UTPCPL when he tried to induce Plaintiff to settle her debt during and shortly after her November 2015 deposition.  Plaintiff brings similar FDCPA and UTPCPL claims against PHDJ and Wells Fargo.  Plaintiff also argues that Wells Fargo misrepresented the status of her debt, both by failing to notify Equifax and other CRAs that the debt was in dispute following the 2012 Foreclosure, and by sending Plaintiff monthly notices even after it had terminated her right to make monthly payments by accelerating her debt.  Finally, Plaintiff maintains that Wells Fargo violated the Fair Credit Reporting Act because it did not adequately investigate her dispute concerning the information it provided to Equifax.

Defendants now move to dismiss Plaintiff's claims pursuant to Rule 12(b)(6).  For the reasons that follow, Defendants' Motions to Dismiss are granted in all respects, except as to Plaintiff's claim against Goodkind and Flaster/Greenberg arising under 15 U.S.C. § 1692g, and her claim against Wells Fargo under § 1692e(8).

## II.    STANDARD

A complaint is properly dismissed under Rule 12(b)(6) when it fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In considering a 12(b)(6) motion, the court must first separate the factual and legal elements of a claim, accepting as true all well-pleaded facts while disregarding any legal conclusions.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.

2009).  The court must then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## III.   DISCUSSION

### A.  FDCPA Claims

Congress enacted the FDCPA to "eliminate abusive debt collection practices by debt collectors," and "to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged."  15 U.S.C. § 1692(e).

> To prevail on an FDCPA claim, a plaintiff must prove that (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt.

*Jensen v. Pressler & Pressler*, 791 F.3d 413, 417 (3d Cir. 2015).  The parties seem to agree that Plaintiff is a consumer within the meaning of the FDCPA, but they dispute whether Plaintiff has satisfied the other three elements of her FDCPA claims.  Because Plaintiff's FDCPA claims vary by defendant, I discuss separately her allegations against Goodkind and Flaster/Greenberg, PHDJ, and Wells Fargo.

#### 1.   FDCPA Claims Against Goodkind and Flaster/Greenberg

Plaintiff's FDCPA claims against Goodkind and his firm, Flaster/Greenberg, arise from Goodkind's questions during the November 13, 2015 deposition and from his follow-up e-mails to Plaintiff's counsel in January 2016.  Plaintiff describes these actions as "conduct the natural consequence of which is to harass, oppress, or abuse in connection with the collection of a debt." Am. Compl. at 9 (quoting 15 U.S.C. § 1692d).  Plaintiff also brings claims under § 1692e, which prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt"; and § 1692f, which prohibits the use of "unfair or

unconscionable means" to collect a debt, including the "collection of any amount . . . unless such

amount is expressly authorized by the agreement creating the debt or permitted by law."  Finally,

Plaintiff characterizes Goodkind's deposition questions and follow-up e-mails as "initial

communications" within the meaning of § 1692g.  As such, Plaintiff maintains that Goodkind was

required to send within five days a written notice detailing various specified information regarding

the debt.

Goodkind first argues that Plaintiff's Amended Complaint fails to establish that he or

Flaster/Greenberg engaged in any debt collection activity, or were debt collectors within the

meaning of the statute.  Lacking these requisite elements of an FDCPA claim, Goodkind argues that

Plaintiff's Amended Complaint must be dismissed.  I disagree.

### a.  Debt Collection Activity

> The FDCPA regulates 'debt collection' but does not define the term.  The statute's
> substantive provisions, however, make clear that it covers conduct taken in
> connection with the collection of any debt.  Put differently, activity undertaken for
> the general purpose of inducing payment constitutes debt collection activity.

*McLaughlin v. Phelan Hallinan & Schmieg, LLP*, 756 F.3d 240, 245 (3d Cir. 2014) (citations and

internal quotation marks omitted).  In keeping with this broad definition of debt collection activity,

our Court of Appeals has repeatedly held that debt collection activity "is not limited to specific

requests for payment," and that "a communication need only convey information regarding a debt,"

to fall within the FDCPA's scope.  *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 266 (3d Cir.

2013) (quoting *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 368 n.5 (3d Cir. 2011)).

Thus, the Third Circuit has held that:

> [C]ommunications that include discussions of the status of payment, offers of
> alternatives to default, and requests for financial information may be part of a
> dialogue to facilitate satisfaction of the debt and hence can constitute debt collection
> activity.

*McLaughlin*, 756 F.3d at 245–46.

The Third Circuit's definition of debt collection activity easily encompasses the conduct at issue here, which has every appearance of an attempt to "facilitate satisfaction of the debt" by means of a settlement.  After learning of Plaintiff's purported Versailles Bond income at the deposition, Goodkind asked Plaintiff whether she had "notified Wells [Fargo]" or "anybody on the lender's side or Phelan."  Am. Compl. Ex. 12 at 20.  Goodkind then made several requests for information related to Plaintiff's bond income, including the likely timing of receipt, and the magnitude of the expected payment.  Am. Compl. Ex. 12 at 20–24; Ex. 3 at 1–3.  As Plaintiff notes, these inquiries about prospective income were irrelevant to the UTPCPL and FDCPA claims that were the subject of the deposition, suggesting that Goodkind's motivation was to broker a satisfaction of the underlying debt.  Further supporting this inference, Goodkind's communications contain multiple references to Plaintiff's "mortgage arrears" and "defaults," Am. Compl. Ex. 12 at 19; Ex. 3 at 1, 3, and multiple invitations for Plaintiff to "offer [a] settlement," Am. Compl. Ex. 3 at 1–3.  Finally, Goodkind began his initial e-mail to Plaintiff's counsel with the disclaimer "PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATION."  Am. Compl. Ex. 3 at 3.

Goodkind maintains, somewhat improbably, that his deposition questions and follow-up e-mails were wholly unrelated to any debt-collection purpose and were merely an attempt to test Plaintiff's credibility.  Because I find that the pleadings create a plausible inference that the "animating purpose" of Goodkind's deposition questions and follow-up e-mails was "to induce payment by the debtor," *Simon*, 732 F.3d at 266 (quoting *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011)), I reject Goodkind's argument and find that Plaintiff has established the required element of debt collection activity.[7]

---

[7] In his Reply Brief, Goodkind argues that his deposition questions and follow-up e-mails cannot be regarded as debt collection activity because:

*b.   Goodkind and Flaster/Greenberg's Status as Debt Collectors*

Independent of whether he engaged in debt collection activity, Goodkind argues that neither he nor Flaster/Greenberg is a debt collector and that they therefore cannot be held liable under the FDCPA.  A person is a debt collector subject to the FDCPA if he or she engages "in any business the principal purpose of which is the collection of any debts, or . . . regularly collects or attempts to collect, directly or indirectly, debts."  15 U.S.C. § 1692a(6).  The "debt collector" label attaches to attorneys who "regularly engage in consumer-debt-collection activity, even when that activity consists of litigation."  *Heintz v. Jenkins*, 514 U.S. 291, 299 (1995).  Thus, the issue here is whether Plaintiff's Amended Complaint contains sufficient factual allegations to support a plausible inference that Goodkind and Flaster/Greenberg "regularly" attempt to collect debts.

Plaintiff points to three paragraphs in her Amended Complaint which she claims are sufficient to defeat Goodkind's Motion to Dismiss.  First, Plaintiff asserts that "[i]n their practice of law, Flaster/Greenberg and Goodkind represent, inter alia, creditors and debt collectors."  Am. Compl. ¶ 9.  Second, Plaintiff seizes on language contained in Goodkind's Response to Plaintiff's now-mooted First Complaint, in which Goodkind described his deposition questions and follow-up e-mails as "routine," "entirely unremarkable," and related to his "duty to his client, Phelan, to follow up on Plaintiff's deposition."  *Id.* ¶ 23.  According to Plaintiff, Defendant's actions would be routine or unremarkable only if Goodkind regularly attempted to facilitate settlement talks—a form

---

> [T]here was (a) no Foreclosure pending when . . . Goodkind followed up with Ms. Hoffmann's counsel, (b) no other debt collection activity against Ms. Hoffmann was being undertaken, (c) no [direct] communication from Flaster to Ms. Hoffmann [herself], (d) [no evidence] that Wells Fargo retained Flaster for any purpose whatsoever nor authorized Flaster to undertake debt collection activity on its behalf[,] and (e) no demand by Flaster that Ms. Hoffmann do anything, much less pay any debt[.]

Goodkind Reply at 6.  Goodkind offer no legal authority to suggest that this list of factors would nullify other conduct aimed at collection of debts.  Based on my own review of the case law, I am satisfied that these factors do not transform Goodkind's conduct into something other than debt collection activity.

10

of debt collection activity.  Third, Plaintiff asserts that "Wells Fargo, PHD&J, Flaster/Greenberg and Goodkind were each a person who used an instrumentality of interstate commerce or the mails in a business the principal purpose of which was the collection of debts or who regularly collected or attempted to collect, directly or indirectly, debts." *Id.* at ¶ 53.

Goodkind correctly notes that the last of these three paragraphs simply restates the FDCPA to reach a legal conclusion; as a conclusory statement unsupported by any facts, it is entitled to little weight under *Twombly* and *Iqbal*.  Plaintiff's other two allegations, however, are not so easily cast aside.

Goodkind argues that his use of the words "routine" and "unremarkable," and his invocation of a "duty to his client" prove nothing about the frequency with which he engages in debt collection activity.  Rather, Goodkind maintains that he used those words only because it is commonplace "for litigators . . . to ask a wide variety of questions to test the veracity and credibility of witnesses," and that here, he "owed a duty to Phelan to discredit Ms. Hoffmann and her incredulous deposition testimony."  Goodkind Reply at 6.  The problem with this argument is Goodkind's deposition questioning and follow-up e-mails indisputably shaded into debt-collection activity.  Hoffmann is therefore correct that Goodkind's characterization of such activity as a normal part of his job supports a plausible inference that he "regularly collected debts on behalf of Phelan and his other debt collector and creditor clients."  Resp. to Goodkind's MTD at 6.  This, combined with the factual allegation that Goodkind regularly represents debt collectors and creditors, is sufficient to defeat Goodkind's Motion to Dismiss on the grounds that neither he nor his firm are debt collectors.

### c.  *Plaintiff's Claims under 15 U.S.C. §§ 1692d–1692f*

With the exception of her claim under § 1692g (discussed below), Plaintiff's FDCPA claims against Goodkind and Flaster/Greenberg are based on the theory that her success in the 2012 Foreclosure had a claim preclusive effect that barred any subsequent attempts to collect on her

mortgage debt.  According to Plaintiff, Goodkind's attempts to broker a settlement necessarily violated § 1692d because the "the natural consequence" of an attempt to collect an uncollectable debt is to "harass, oppress, or abuse" the purported debtor.  Resp. at 8.[8]  Similarly, Plaintiff argues that, because res judicata should bar continued attempts to collect on her mortgage debt, Goodkind's references to a default and to mortgage arrears "misrepresented the character and/or legal status of a debt," in violation of § 1692e, and were "unfair and unconscionable" attempts to "collect amounts . . . that were not . . . permitted by law," in violation of § 1692f.  *Id.* at 9.

Plaintiff's res judicata argument turns largely on Wells Fargo's acceleration of her debt prior to the 2012 Foreclosure, and its attempt in the 2012 Foreclosure to collect her **entire** unpaid principal balance.  Because the terms of her mortgage were not altered after the 2012 Foreclosure, Plaintiff contends that any subsequent attempts to collect on her mortgage necessarily sought recovery of the same unpaid principal balance that was the subject of the 2012 Foreclosure.  Plaintiff also maintains that, because Wells Fargo never reinstated her right to make monthly payments after her successful defense of the 2012 Foreclosure, her failure to pay her mortgage following the 2012 Foreclosure could not be characterized as a new default that would justify subsequent attempts to collect on her mortgage debt.  Therefore, Plaintiff maintains, any debt collection activity following the 2012 Foreclosure must necessarily be "identical" to that action "in terms of the thing sued upon or for" (the unpaid mortgage), "and the cause of action" (her prior default), with the result that res judicata would apply.

In the 2016 foreclosure action now pending in state court, Plaintiff has, by way of preliminary objection, made essentially the same claim preclusion argument she makes here.  That

---

[8] While it is not entirely clear, Plaintiff also seems to argue that Goodkind's deposition questions and follow up e-mails rose to the level of "obscene or profane language or language the natural consequence of which is to abuse the hearer or reader."  Am. Compl. ¶ 52 (quoting 15 U.S.C. § 1692d(2)).  This allegation is baseless.  Plaintiff's Amended Complaint makes clear that Goodkind merely referred to Plaintiff's alleged debt and asked her if she intended to settle it.  Goodkind's conduct was appropriate and professional.

preliminary objection was overruled without elaboration, but Defendants concede that res judicata remains a possible bar to the 2016 Foreclosure.  Accordingly, Goodkind and Flaster/Greenberg (along with co-Defendant PHDJ)  urge that I defer to the state court proceeding by abstaining from deciding Plaintiff's FDCPA claims until the 2016 Foreclosure is resolved.  I decline to do so. Contrary to Defendants' argument, this case does not present the "extraordinary circumstances" that justify deviation from the Court's "virtually unflagging obligation" to exercise the jurisdiction conferred by Congress.  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 817 (1976).  Unlike the state court in the 2016 Foreclosure, I need not reach a final determination on whether the 2012 Foreclosure has a claim preclusive effect that bars subsequent attempts to collect on Plaintiff's mortgage debt.  Rather, to resolve the bulk of Plaintiff's FDCPA claims, I need only determine whether res judicata so clearly applied that any attempt at debt collection following the decision in the 2012 Foreclosure was oppressive, unconscionable, or otherwise violated the FDCPA as a matter of law.

Turning to the merits, the Supreme Court has cautioned against interpreting the FDCPA so broadly as to penalize good faith attempts at debt collection that ultimately fail.  While patently baseless attempts at debt collection might constitute the sort of abusive conduct that violates the FDCPA, the Court has noted that, simply because "a lawsuit turns out ultimately to be unsuccessful," does not, "by itself, make the bringing of it an action that cannot legally be taken." *Heintz*, 514 U.S. at 296.  Here, it appears that Goodkind had a colorable (if uncertain) legal basis for representing Plaintiff's continued nonpayment as an actionable default that warranted settlement negotiations.

Neither the Third Circuit nor the Pennsylvania Supreme Court has definitively ruled on whether a lender that accelerated a debt and then sued for the entire balance owed under a mortgage, but lost, can then bring a second action on the basis of the borrower's continuing failure

to pay.  Courts are divided on this question and three general approaches have emerged.  The Ohio

Supreme Court has concluded that when a lender accelerates a debt, but fails in a suit to collect on

that debt, the doctrine of res judicata bars a subsequent suit because, as Plaintiff argues here, the

previous acceleration means that the later action necessarily seeks recovery of the same amount as

the first suit—the unpaid principal balance.  *U.S. Bank Nat'l Ass'n v. Gullotta*, 899 N.E.2d 987

(Ohio 2008).  Courts in Florida and Indiana take a different approach, one exemplified by the

Florida Supreme Court's decision in *Singleton v. Greymar Associates*, 882 So. 2d 1004 (Fla. 2004).

There, a mortgage lender accelerated a debt and sued for collection of the full outstanding balance,

but the suit was dismissed with prejudice when lender's counsel failed to appear at a case

management conference.  *Id.* at 1005.  In allowing a second suit on the same debt to proceed, the

Court held that "the unique nature of the mortgage obligation and the continuing obligations of the

parties in that relationship" weighed in favor of treating as a separate default the mortgagor's

ongoing nonpayment following the initial suit.  *Id.* at 1007–08.[9]  Finally, the Vermont Supreme

Court has staked out a middle ground between the Florida and Ohio approaches.  *Cenlar FSB v.

Malenfant*, 151 A.3d 778 (Vt. 2016).  In Vermont, a lender that accelerates a mortgage and then

unsuccessfully brings a foreclosure action is barred by res judicata from subsequently attempting to

collect on the entire outstanding principal balance.  *Id*. at 790–91.  The lender can, however, bring a

subsequent suit to recoup any taxes and insurance premiums that it paid on the foreclosed property,

following the resolution of the initial suit.[10]  *Id.* at 792.

---

[9] *See also Afolabi v. Atl. Mortg. & Inv. Corp.*, 849 N.E.2d 1170 (Ind. Ct. App. 2006) (reaching the same conclusion as the court in *Singleton*).

[10] From one perspective, the issue is whether there should be an exception to the traditional rules of res judicata in actions brought to enforce a mortgage.  As a policy matter, the securitization of mortgages has spawned multiple problems in tracking the instruments that govern the loan.  *See* Cong. Oversight Panel, No. 61-835, November Oversight Report: Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation 12–17 (2010) (discussing

While Pennsylvania has yet to formally adopt any of these approaches, *Singleton* has been cited approvingly by the Pennsylvania Superior Court and the Third Circuit, albeit in unpublished decisions. *See Mortg. Elec. Registration Sys., Inc. v. Dimou*, No. 911 EDA 2013, 2014 WL 10965798 (Pa. Super. Ct. Apr. 28, 2014) (affirming as "well-reasoned" a trial court decision that relied in part of *Singleton*); *Fairbank's Capital Corp. v. Milligan*, 234 F. App'x 21, 22 (3d Cir. 2007) (adopting *Singleton*'s "persuasive" reasoning to permit a subsequent mortgage foreclosure action based on defaults occurring after dismissal of the initial debt acceleration and foreclosure action). *Dimou* and *Milligan* are non-precedential and therefore not dispositive of Plaintiff's res judicata argument. But taken together, and in the absence of any other relevant decisions, they at least provide a defensible legal basis Defendants could assert in attempting to collect following the conclusion of the 2012 foreclosure action. While Plaintiff's res judicata defense may yet prove successful in the 2016 foreclosure action, or the state court might limit the scope of recoverable damages,[11] given the absence of controlling authority barring the claim when it was filed, such ultimate success on the merits would still not prove that Defendants violated the FDCPA.

---

the challenges of properly recording the assignments of a mortgage that has been pooled in a mortgage-backed security). It is hard to tell if Wells Fargo's initial loss in state court stemmed from the fact that it was at least the *fifth* holder of the debt. Suffice it to say that the inability of a lender even to authenticate the documents that form the basis for its foreclosure certainly represents a fundamental defect. Allowing lenders to refile and pursue collection action is a moral hazard in that it imposes no penalty for irresponsible conduct, whether on their part, or the part of their counsel. *See Cenlar*, 151 A.3d at 795 (Dooley, J., dissenting) (allowing a second action is "not consistent with settled claim preclusion law, gives the lender a windfall it doesn't deserve and, most important, lets lender's counsel avoid most of the consequences of the way it practices law in our courts.") Other courts are more concerned with avoiding a "windfall" to buyers. *See, e.g.*, *Singleton*, 882 So. 2d at 1008. These competing concerns are discussed at length in Megan Wachspress, Jessie Agatstein, Christian Mott, Comment, *In Defense of "Free Houses*," 125 Yale L.J. 1115 (2016).

[11] For example, one could easily conceive of the state court barring recovery of the accelerated principal, which was claimed in the unsuccessful 2012 action, but allowing recovery of payments advanced by Wells Fargo for taxes and insurance.

Accordingly, Goodkind and Flaster/Greenberg's Motion to Dismiss is granted as to Plaintiff's

claims arising under 15 U.S.C. §§ 1692d–1692f.

> ### d.  *Plaintiff's Claim Under 15 U.S.C. § 1692g*

Section 1692g provides in pertinent part that:

> Within five days after the initial communication with a consumer in connection with
> the collection of any debt, a debt collector shall, unless the following information is
> contained in the initial communication . . . send the consumer a written notice
> containing [certain information concerning the nature of the debt and providing the
> consumer with an opportunity to dispute the validity of that debt].

Plaintiff maintains that Goodkind violated § 1692g when he failed to send the requisite written

notice after he posed his deposition questions or sent his follow-up e-mails.  Goodkind's only

arguments in rebuttal are that his actions did not rise to the level of debt collection activity and that

he was not a debt collector.  For the reasons noted above, Goodkind's arguments fail and his Motion

to Dismiss is denied as to Plaintiff's claim under § 1692g.

> ### 2.  FDCPA Claims Against PHDJ

Plaintiff's FDCPA claims against PHDJ are based on the April 13, 2016, Debt Validation

Letter, and the commencement on April 29, 2016, of the 2016 Foreclosure.

Plaintiff advances two related but distinct theories as to why PHDJ's actions violated the

FDCPA.  First, she makes the same res judicata argument that she used against Goodkind and

Flaster/Greenberg, contending that, like Goodkind's deposition questions and follow-up e-mails,

PHDJ's Debt Validation Letter and 2016 Foreclosure Complaint necessarily violated 15 U.S.C.

§§ 1692d–1692f because of the claim preclusive effect of the 2012 Foreclosure.  Second, Plaintiff

maintains that Wells Fargo's acceleration of her mortgage obligation in 2012 had the effect of

freezing her debt at 2012 levels.  Therefore, she argues, PHDJ's attempt to collect more than the

$33,076.30 that was the subject of the 2012 Foreclosure necessarily violated various provisions of

§ 1692e and § 1692f.  Neither of these arguments succeeds.

Plaintiff's res judicata argument fails for the reasons discussed above.  Although the law is unsettled in Pennsylvania, there was no prohibition against PHDJ sending the Debt Validation Letter or initiating the 2016 Foreclosure.  That, coupled with the complete lack of oppressive or outrageous behavior by PHDJ, is sufficient to defeat Plaintiff's claim.

Similarly unavailing is Plaintiff's contention that PHDJ acted illegally when it attempted to collect interest and expenses that accrued after the 2012 Foreclosure.  Plaintiff points to no contractual language, case law, or statutory authority to justify her position; she apparently believes it to be self-evident that her debt was capped at the amount she owed when the mortgage was first accelerated.  The facts show otherwise.

Based on the exhibits to Plaintiff's Amended Complaint, it is clear that much of the post-2012 debt that PHDJ sought to recoup through 2016 Foreclosure was attributable to "escrow advances"—payments by Wells Fargo of real estate taxes and hazard insurance for the Darby property.  Hoffman did not repudiate these payments and instead continued to reap to benefits of Wells Fargo's escrow advances.  Even if the state court bars Wells Fargo from collection of the unpaid principal balance, these post-acceleration expenses would seem to be recoverable.

Furthermore, as PHDJ notes, the express terms of the Mortgage and Note undercut Plaintiff's contention that Well Fargo's initial acceleration of the mortgage froze her debt at 2012 levels.  Paragraph 18 of the Mortgage provides that if the lender accelerates the debt pursuant to a default, it "shall be entitled to collect all expenses incurred in pursuing [a foreclosure action]." Am. Compl. Ex. 1 at *14.  Similarly, paragraph 6(C) of the Notes provides that "if Lender has required immediate payment in full. . . . Lender may require Borrower to pay costs and expenses. . . .  Such costs shall bear interest from the date of disbursement at the same rate as the principal of this Note." *Id* at *21.  Plaintiff makes no attempt to explain away these provisions, nor does she offer any countervailing contractual terms that support her argument.

17

Because the Mortgage and Note expressly permit collection of post-acceleration expenses and interest, and because much of the post-2012 increase in Plaintiff's debt was due to escrow advances that apparently benefitted her, Plaintiff must do more to establish a cognizable FDCPA claim based on PHDJ's attempt to collect an amount higher than the amount at issue in the 2012 Foreclosure. Because I find that she has failed to carry her minimal pleading burden by explaining the legal basis for her claim, Plaintiff's FDCPA action against PHDJ is dismissed.

3. FDCPA Claims Against Wells Fargo

Based on Wells Fargo's Notice Letter and monthly billing notices, Plaintiff asserts a hodgepodge of FDCPA claims against Wells Fargo under 15 U.S.C. §§ 1692d–1692f . Before proceeding to the substance of Plaintiff's claims, I must first resolve the threshold matter of Wells Fargo's status as a debt collector.

a. *Wells Fargo's Status as a Debt collector*

Wells Fargo claims that, for the purposes of this litigation, it is a creditor, and not a debt collector. Because "[c]reditors . . . generally are not subject to the FDCPA," *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 403 (3d Cir. 2000), Wells Fargo argues that Plaintiff's FDCPA claims against it must be dismissed. The creditor/debt collector distinction that Wells Fargo invokes is based on the text of the FDCPA. The statute defines "debt collector" as one who attempts to collect debts "owed or due . . . [to] another." 15 U.S.C. § 1692a(6). By contrast, under the FDCPA, a creditor is one who "offers or extends to offer credit creating a debt or *to whom a debt is owed*." § 1692a(4) (emphasis added). In the 2013 federal action, it was established that Wells Fargo did in fact possess legal title to the Mortgage at the time of the 2012 Foreclosure. *Hoffman v. Wells Fargo Bank, N.A.*, No. 13-CV-5700, 2015 WL 3755207 (E.D. Pa. June 16, 2015); *Hoffman v. Phelan Hallinan, LLP*, No. 13-CV-5700, 2016 WL 4089163 (E.D. Pa. Aug. 2, 2016). However, not all parties collecting debts in their own names are creditors. Significantly, the FDCPA excludes from

18

the definition of creditor "any person . . . that . . . receives an assignment or transfer of a debt in default." § 1692a(4). Consequently, Wells Fargo's status as a creditor or debt collector depends on an issue not reached in the previous dispute between these parties: whether Wells Fargo obtained title to Plaintiff's debt before Plaintiff defaulted in August 2011.

Plaintiff advances two arguments in support of her claim that Wells Fargo acquired her debt after it was in default. First, Plaintiff maintains that, as of August 2011, Wells Fargo had not yet acquired the Note. In support of this assertion, Plaintiff cites a letter that she received from Wells Fargo dated October 17, 2011, which reads: "[Y]our pending mortgage assistance required approval from the investor that ultimately owns your mortgage, and the investor has declined your request." Am Compl. Ex. 11. According to Plaintiff, the letter's language creates a plausible inference that, as of October 2011, Wells Fargo was not the holder of Plaintiff's debt and thus could only have obtained it after her default. Second, Plaintiff contends that, even if Wells Fargo was in possession of her loan at the time of her initial default, "perhaps . . . it transferred the loan and then re-obtained it" at some point between 2013 and 2016 when the mortgage was in default. Resp. to Wells Fargo MTD at 11.

That Plaintiff couches her second argument as a hypothetical—"perhaps"—is both telling and fatal. As Wells Fargo notes, any recorded assignment of the Mortgage between 2013 and 2016 would be a matter of public record available to Plaintiff without the need to take discovery. Plaintiff's use of the adverb "perhaps" strongly indicates that, consistent with Wells Fargo's representations, no such recorded assignment took place. That leaves the possibility of an unrecorded assignment and reacquisition by Wells Fargo. But the Supreme Court has held that the "mere possibility of misconduct" is not enough to defeat a Motion to Dismiss pursuant to Rule 12(b)(6). *Iqbal*, 556 U.S. at 679. Rather, a complaint must "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Here, Plaintiff's notional allegation is utterly devoid of any factual assertion that, accepted as true, would support her claim.  Her argument that Wells Fargo might have assigned and reacquired her debt therefore does nothing to advance her claims.

By contrast, Plaintiff's initial argument—that Wells Fargo did not acquire the Note until after her default in August 2011—is supported by the October 17, 2011 letter and therefore rests on firmer ground.  Wells Fargo disputes the probative force of that letter, noting that, pursuant to my August 2016 opinion in the previous action, "the fact that another entity may have an interest in the Loan does not make such an entity the legal owner of the Note or Mortgage, but rather the equitable owner."  Wells Fargo Reply at 11.  Wells Fargo may have a point, but at the pleading stage, all plausible inferences must be drawn in favor of the non-moving party.  I agree with Plaintiff that the October 17, 2011 letter's reference to "the investor that ultimately owns your mortgage" can be read as an admission that Wells Fargo was not in possession of Plaintiff's debt as of October 2011.  This reading creates a plausible inference that Wells Fargo did not acquire Plaintiff's debt until after her default in August 2011 and was therefore a debt collector within the meaning of the FDCPA.

But the matter of Wells Fargo's debt collector status does not end there.  Further complicating things, this very issue was already litigated during the previous federal court action, which at that time was before Judge Dalzell.  The parties now disagree over the preclusive effect of that earlier litigation.[12]  There as here, Wells Fargo maintained that it had acquired Plaintiff's debt prior to her initial default.  Although Judge Dalzell resolved the matter in Wells Fargo's favor, he never reached the merits of either party's argument and instead determined Wells Fargo's debt collector status based on a pleading technicality.  Specifically, Judge Dalzell found that Hoffmann had never actually alleged that her debt was in default when Wells Fargo acquired it.  Instead, she

---

[12] It is at this point that allusions to Dickens's perpetual lawsuit in <u>Bleak House</u>, *Jarndyce v. Jarndyce*, would seem pertinent.

claimed that "[t]he alleged debt that is the subject of this action *was alleged by Defendants* to have been in default at the time it was obtained by Defendants." *Hoffmann v. Wells Fargo Bank, N.A.*, No. 13-CV-5700, slip op. at 9 (E.D. Pa. Feb. 21, 2014) (emphasis added).[13]  Because he found that the defendants had made no such allegation, Judge Dalzell held that Hoffmann had failed to plead facts sufficient to show that Wells Fargo was a debt collector and granted Wells Fargo's Motion to Dismiss the FDCPA claims.  *Id.* at 10–11.  For the sake of convenience, I will refer to the order dismissing Plaintiff's previous FDCPA claims against Wells Fargo as the 2014 Order.

Wells Fargo argues that the 2014 Order has an issue preclusive effect that bars Plaintiff from re-litigating Wells Fargo's status as a debt collector.  Plaintiff counters by noting that her Amended Complaint in this case avoids the pleading error that doomed her earlier Complaint because it alleges that her "debt was in default at the time it was obtained by each of Defendants."  Am. Compl. ¶ 52.  Accordingly, Plaintiff maintains that the issue presented here differs materially from the issue decided in the 2014 Order and issue preclusion is inapplicable.[14]

Plaintiff clearly had an opportunity in the earlier federal action to litigate Wells Fargo's status as a debt collector.  But it is equally clear that Judge Dalzell did not determine when Wells Fargo acquired Plaintiff's debt.  Rather, the only relevant issue resolved by his 2014 Order was the

---

[13] Throughout the 2012 Foreclosure and the previous federal suit, Plaintiff maintained that she never actually defaulted on her mortgage; the peculiar (and ultimately self-defeating) construction that she employed in her earlier Complaint was consistent with this position.

[14] The requirements for issue preclusion, or collateral estoppel, are satisfied when:

> (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment.

*Peloro v. United States*, 488 F.3d 163, 175 (3d Cir. 2007).  The dispute here focuses on the first requirement of issue preclusion.

legal adequacy of Plaintiff's previous Complaint. Here, Plaintiff's Amended Complaint avoids the earlier Complaint's pleading error; the 2014 Order therefore has no issue preclusive effect.[15]

Because Plaintiff's Amended Complaint states a plausible claim that Wells Fargo acquired her debt after it was in default, and because the 2014 Order does not have an issue preclusive effect that bars this claim, I find that Plaintiff has adequately plead facts alleging that Wells Fargo was a debt collector within the meaning of the FDCPA.[16]

### b. Plaintiff's Claims Under 15 U.S.C. §§ 1692d, 1692f

The apparent crux of Plaintiff's claims under § 1692d and § 1692f is that Wells Fargo's Notice Letter and monthly billing notices were somehow abusive, misleading, unfair, or unconscionable in light of the 2012 Foreclosure and Wells Fargo's previous acceleration of Plaintiff's debt.

The main problem with this theory is that it ignores Plaintiff's right under Pennsylvania law to cure her default up to an hour before a foreclosure sale by tendering a payment equal to the sum of monthly payments that "would have been due . . . in the absence of default and the exercise of an acceleration clause." 41 Pa. Stat. and Cons. Stat. Ann. § 404.[17] Given this right, I do not see how

---

[15] Res judicata, rather than collateral estoppel, would seem to be a stronger legal argument for preclusion, but that argument has not been raised.

[16] Like Goodkind and PHDJ, Wells Fargo also vigorously argues that deciding Plaintiff's FDCPA claims will necessarily interfere with the state court's decision of the 2016 Foreclosure and that I should therefore abstain from deciding this matter under the doctrine articulated in *Colorado River*. This argument has no merit. "The threshold requirement for a district court to entertain abstention is a contemporaneous parallel judicial proceeding. For judicial proceedings to be parallel, there must be identities of parties, claims, and time." *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 306 (3d Cir. 2006). The legality under the FDCPA of Wells Fargo's monthly billing notices and its reporting practices to CRAs is not directly or indirectly before the state court in the 2016 Foreclosure. I therefore decline Wells Fargo's invitation to abstain from deciding Plaintiff's claim.

[17] The right to cure a default guaranteed under Pennsylvania law also finds expression in ¶ 10 of the Mortgage, which provides:

Wells Fargo acted illegally by sending monthly billing notices that included a running tally of Plaintiff's cure amount—i.e., the payments Plaintiff would have owed, notwithstanding the acceleration of her debt.  Similarly, the Notice Letter merely listed Plaintiff's then-current cure amount and rightly warned her that this amount would increase with continued nonpayment.  In other words, it accurately summarized Plaintiff's right to cure under Pennsylvania law and provided her information necessary to exercise this right.

Plaintiff effectively seeks to punish Wells Fargo for providing her with information that she could have used to stave off foreclosure.  Because such an outcome would run contrary to the FDCPA's animating purpose of "giv[ing] debtors reliable information so that they can make informed decisions about how to address debts," *Jensen*, 791 F.3d at 421, Plaintiff's FDCPA claims based on the monthly notices and Notice Letter must be rejected.[18]

### c.  *Plaintiff's Claim Under 15 U.S.C. § 1692e(8)*

Although Plaintiff's claims under § 1692d and § 1692f fail, I find that she states a cognizable claim under § 1692e(8).  That provision bars debt collectors from "[c]ommunicating or

---

Reinstatement.  Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument.  This right applies even after foreclosure proceedings are instituted.  To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current . . . Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full.

Am. Compl. Ex. 1 at *13.

[18] It is unclear from the Amended Complaint if Plaintiff also wishes to argue that the outcome of the 2012 Foreclosure precluded Wells Fargo from threatening to foreclose and from initiating, through PHDJ, the 2016 Foreclosure.  To the extent that Plaintiff does bring such a claim, I find that it fails for same reason as her res judicata-based claims against PHDJ, Goodkind and Flaster/Greenberg.

threatening to communicate to any person credit information which is known or which should be known to be false, *including the failure to communicate that a disputed debt is disputed*." (emphasis added).  Plaintiff clearly disputed her debt when she contested the 2012 Foreclosure and Wells Fargo doubtless knew of the dispute.  Plaintiff argues that Wells Fargo violated § 1692e(8) by regularly notifying Equifax and other CRAs when Plaintiff missed a scheduled mortgage payment without also mentioning that Plaintiff's debt was disputed.  Plaintiff supports this claim with a copy of her Equifax credit report, dated May 31, 2016, which contains no reference to her debt's disputed status.  Am. Compl. Ex. 5.  Wells Fargo offers no reason why this claim should be dismissed and my review of the case law discloses no clear defects.[19]  Accordingly, Wells Fargo's Motion to Dismiss is denied as to Plaintiff's claim under § 1692e(8).

### B.  Fair Credit Reporting Act (FCRA) Claims Against Wells Fargo

Congress enacted FCRA "to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner."  *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010).  Under FCRA, CRAs "collect consumer credit data from 'furnishers,' such as banks . . . , and organize that material into individualized credit reports, which are used by commercial entities to assess a particular consumer's creditworthiness."  *Seamans v. Temple Univ.*, 744 F.3d 853, 860 (3d Cir. 2014).  The CRA at issue here is Equifax and the parties agree that Wells Fargo is a "furnisher" under FCRA.

Plaintiff sues Wells Fargo under two provisions of FCRA.  First, she alleges that Wells Fargo violated 15 U.S.C § 1681s-2(b) because it failed to conduct a reasonable investigation after it

---

[19] Wells Fargo notes only that it marked Plaintiff's debt as disputed after it was notified by Equifax in June 2016 that she had challenged information on her credit report that Wells Fargo had provided.  This does nothing to undermine Plaintiff's § 1692e(8) claim, however, since that claim was based on Wells Fargo's failure prior to June 2016 to notify CRAs of her accounts disputed status.

was notified by Equifax that Plaintiff had disputed information supplied by Wells Fargo.  Second,

Plaintiff claims that Wells Fargo sought and received Plaintiff's credit report without a permissible

purpose for doing so, a violation of § 1681b.  I consider each claim in turn.

       1.   Plaintiff's Claim under 15 U.S.C. § 1681s-2(b)

Under FCRA, "a private citizen wishing to bring an action against a furnisher must first file

a dispute with the [CRA]."  *SimmsParris v. Countrywide Fin. Corp.*, 652 F.3d 355, 359 (3d Cir.

2011).  That CRA, in turn, must forward "all relevant information regarding that dispute" to the

furnisher that provided the disputed information.  § 1681(i)(a)(2).  After the furnisher receives

notification of the dispute from the CRA, § 1681s-2(b)(1) requires (in pertinent part) that it:

> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the consumer reporting agency
> pursuant to section 1681i(a)(2) of this title;
> (C) report the results of the investigation to the consumer reporting agency;
> (D) if the investigation finds that the information is incomplete or inaccurate, report
> those results to all other consumer reporting agencies to which the person furnished
> the information and that compile and maintain files on consumers on a nationwide
> basis[.]

If a furnisher fails to undertake any of these required actions, the aggrieved consumer can sue for

noncompliance.

In sum, to state a cognizable claim under § 1681s-2(b), Plaintiff must establish:

> (1) that [s]he notified a CRA of the dispute under § 1681i, (2) that the CRA notified the
> party who furnished the information, and (3) that the party who furnished the information
> failed to investigate or rectify the disputed charge.

*Horsch v. Wells Fargo Home Mortg.*, 94 F. Supp. 3d 665, 672 (E.D. Pa. 2015).

Plaintiff clearly alleges facts sufficient to establish the first and second elements of her

§ 1681s-2(b) claim.  As to the first element, Plaintiff states that some time around June 6, 2016, she

notified various CRAs "of a dispute with regard to the completeness and/or accuracy of . . .

information provided by Wells Fargo."  Am. Compl. ¶ 41.  Plaintiff bolsters this assertion with a

copy of the "Research Request Form" that she submitted to Equifax.  As to the second element, Plaintiff maintains that Equifax notified Wells Fargo of the dispute and that "Wells Fargo verified its said credit information," on or before June 23, 2016.  Am. Compl. ¶ 43.  In support of this claim, Plaintiff points to a copy of a resolution report that she received from Equifax, which summarizes the actions taken in response to her dispute notification, including that Equifax "verified that this [account] belongs to you," and that Wells Fargo provided "additional information . . . regarding this item."  Am. Compl. Ex. 10.

Because Plaintiff has established that she notified Equifax of her credit report dispute, and that Equifax notified Wells Fargo of that dispute, her § 1681s-2(b) claim comes down to whether Wells Fargo failed to investigate or rectify the disputed account.  Wells Fargo notes that FCRA requires furnishers to rectify information only "if [an] investigation finds that the information is incomplete or inaccurate."  § 1681s-2(b)(1)(D).  Because Plaintiff does not allege that Wells Fargo's investigation uncovered any inaccuracy regarding her account, Wells Fargo argues that Plaintiff has failed to state a claim based on its failure to rectify disputed information.  I agree.  The inquiry therefore narrows to whether Wells Fargo failed to investigate Plaintiff's dispute.

Wells Fargo construes Plaintiff's allegation that "Wells Fargo verified its . . . credit information" as an admission that Wells Fargo did in fact conduct an investigation.  It therefore argues that Plaintiff has pled her way out of a claim.  Plaintiff concedes that Wells Fargo looked into her dispute, but she correctly notes that FCRA confers a right not just to an investigation, but to a *reasonable* investigation.  *See Seamans*, 744 F.3d at 864 (holding that "a furnisher's post-dispute investigation into a consumer's complaint must be 'reasonable'").  According to Plaintiff, whatever Wells Fargo did to verify her claim, its actions fell short of what "a reasonably prudent person would [have done] under the circumstances."  *Id*. at 864.

In most cases like this, the details of a given investigation will be known only to the furnisher, and a FCRA plaintiff will have to take some discovery in order to vindicate her right to a reasonable investigation.  This inherent information asymmetry between furnishers and consumers makes the typical § 1681s-2(b) claim particularly ill-suited to resolution at the pleading stage.  But this is not a typical case.

The Third Circuit has held that a dispute notification's completeness and specificity are "important" factors to consider when assessing reasonableness.  *Id.* at 865.  Thus, "where a given notice contains only scant or vague allegations of inaccuracy, a more limited investigation may be warranted."  *Id.*  Here, the problem is not that Plaintiff's dispute notification contains vague or scant allegations, but rather that her dispute notification contains no allegations whatsoever.  On the Research Request Form that Plaintiff submitted to Equifax, in the section labeled "Reason for Investigation Request,"  Plaintiff simply checked the box labeled "Other" and wrote "see attached court ruling," meaning the decision in the 2012 Foreclosure.  Am. Compl. Ex. 14.  This complete lack of elaboration might be excusable if the nature of Plaintiff's FCRA dispute was apparent from the 2012 Foreclosure decision, but that is not the case.  Plaintiff now describes the alleged inaccuracy in her credit report this way:

> [A]s of Wells Fargo's pre-foreclosure acceleration of debt, pursuant to paragraphs 9 and 18 of the mortgage and paragraph 6(B) of the note, and cancellation of Plaintiff's right to pay the debt in monthly installments, monthly installment payments, as such, ceased to become scheduled, due, or past due . . . but, regardless, Wells Fargo continued to report, at least, that "[m]onthly (due every month)" is "Scheduled Payment Amount: $574[.]"

Resp. to WF MTD at 13.  I fail to see how Wells Fargo could have discerned this, or any other, dispute regarding credit information based only on the 2012 Foreclosure decision.  There is no mention in that decision of Plaintiff's credit report.  Nor is there any discussion of the acceleration of Plaintiff's debt, let alone its impact on Plaintiff's ongoing obligations to make monthly mortgage

payments.  Finally, the 2012 Foreclosure decision turned on an evidentiary technicality and in no way described Plaintiff's mortgage debt as erased.

In order for Wells Fargo to conduct an appropriate investigation into Plaintiff's dispute, Plaintiff needed to provide some clue as to the basis of that dispute.  Her failure to do so meant that Wells Fargo's corresponding investigatory responsibility was minimal.  On the unique facts of this case, where Plaintiff  failed to provide any insight into the nature of her dispute, I find that even a cursory investigation performed by Wells Fargo would pass muster as "reasonable" for purposes of § 1681s-2(b).  Because the parties agree that some level of investigation took place, I find that Plaintiff's claim fails as a matter of law.

2.  Plaintiff's Claim Under 15 U.S.C. § 1681b

Section 1681b(f) provides that:

A person shall not use or obtain a consumer report for any purpose unless--

(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section[.]

The purposes for which a CRA may furnish a credit report are spelled out at § 1681b(a).  In pertinent part, that provision authorizes CRAs to issue reports "to a person which it has reason to believe:

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
. . .
(F) otherwise has a legitimate business need for the information—
. . .
(ii) to review an account to determine whether the consumer continues to meet the terms of the account.

Plaintiff alleges that Wells Fargo violated 15 U.S.C. § 1681b because it obtained her credit report without a permissible purpose.  Wells Fargo does not dispute that it accessed Plaintiff's credit report, but claims that it acted legally because it did so (1) "in connection with a credit transaction

. . . involving the . . . review or collection of an account" and (2) "to review an account to determine whether the consumer continues to meet the terms of the account."

Wells Fargo's right to access Plaintiff's credit report depends on the existence of a debtor/creditor relationship.  According to Plaintiff, the 2012 Foreclosure terminated her debtor/creditor relationship with Wells Fargo because her success in that action barred subsequent attempts to collect on her Mortgage.  In response, Wells Fargo notes that Plaintiff's debt was actually based on two instruments:  the Mortgage (secured by the house in Darby) and the Note (for which Plaintiff was personally liable).  Even granting Plaintiff's argument that the 2012 Foreclosure barred any subsequent in rem action on the Mortgage, Wells Fargo persuasively argues that, under Pennsylvania law, there is precedent that would allow it to bring an in personam action to collect on the Note.  *See Ingomar Ltd. P'ship v. Current*, No. CIV.A. 1:06CV1433, 2008 WL 660099, at *3 (M.D. Pa. Mar. 6, 2008) (holding that an action on a note is "separate and distinct" from an action on a mortgage, and that "a creditor's inability to recover in rem does not affect its alternative right to proceed in personam"); *accord Kondratick v. Beneficial Consumer Disc. Co.*, No. CIV.A. 04-4895, 2005 WL 2314042 (E.D. Pa. Sept. 21, 2005) (Kelly, J.).  Thus, whatever claim preclusive effect the 2012 Foreclosure had, it appears that Plaintiff remained personally liable for the Note and Wells Fargo's debtor/creditor relationship with Plaintiff therefore remained intact.

Plaintiff responds that Wells Fargo never actually brought an in personam action to collect on the Note.  This argument misses the mark.  FCRA permits creditors to access credit information so long as they do so "in connection" with "the review" of an account.  The law does not require that creditors necessarily initiate collection actions to justify their use of the credit report.  Wells Fargo possessed the Note.  Plaintiff was in default under the terms of the Note.  Therefore, Wells Fargo could legally access Plaintiff's credit report to assess her ability to make good on her debt. Plaintiff makes no factual allegation supporting a plausible inference that Wells Fargo used her

29

credit report for any impermissible ulterior purpose.  Wells Fargo's Motion to Dismiss is therefore granted.

### C.  Unfair Trade Practices and Consumer Protection Law (UTPCPL) Claims

Finally, Plaintiff brings a bevy of claims against Wells Fargo, Goodkind, Flaster/Greenberg, and PHDJ under the UTPCPL, 73 Pa. Stat. and Cons. Stat. Ann. §§ 201-1 *et seq.*  Plaintiff's UTPCPL claims arise from the same conduct that was the subject of her FDCPA claims, namely, Goodkind's deposition questions and follow-up e-mails, and PHDJ and Wells Fargo's initiation of the 2016 Foreclosure.  While the factual underpinnings differ across Plaintiff's multiple UTPCPL claims, all those claims suffer from a common defect:  the failure to demonstrate that Plaintiff justifiably and detrimentally relied on Defendants' unfair or deceptive acts.

"The UTPCPL is Pennsylvania's consumer protection law and seeks to prevent unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Bennett v. A.T. Masterpiece Homes*, 40 A.3d 145, 151 (Pa. Super. Ct. 2012).  To state a cognizable UTPCPL claim, a plaintiff must establish that the defendant engaged in an activity proscribed under the law, that "the plaintiff . . . justifiably relied on the defendant's wrongful conduct or representation[,] and that he suffered harm as a result of that reliance." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 501, 854 A.2d 425, 438 (2004).

Plaintiff's UTPCPL claims share the same theory of reliance:  that Plaintiff was justified in relying on "Defendants' misrepresentations with regard to the need to defend the second foreclosure action and related collection attempts to protect her home and other property."  Resp. to Goodkind MTD at 13; *see also* Resp. to WF MTD at 18 (same).  Plaintiff's theory of ascertainable harm is likewise uniform across her UTPCPL claims:  "Plaintiff claimed costs and attorney's fees incurred in defense of the second foreclosure action and related collection attempts, and [these costs] constitute an ascertainable loss under the UTPCPL." *Id.*

This theory of detrimental reliance would only be valid if the 2012 Foreclosure extinguished Defendants' right to collect on Plaintiff's debt as a matter of law, rendering the 2016 Foreclosure improper.  As previously discussed, Pennsylvania law is not settled on this matter.  Because the bringing of a suit based on a potentially viable legal theory is not proscribed under the UTPCPL, Plaintiff cannot link her ascertainable losses to unfair or deceptive activity.  Wells Fargo may lose again in the 2016 Foreclosure, but that outcome would not affect my analysis of Plaintiff's claim. As I held previously with respect to the UTPCPL, "[t]here is a difference between losing a case and engaging in wrongful conduct."  *Hoffman*, 2015 WL 3755207, at *5.  Defendants' Motions to Dismiss Plaintiff's UTPCPL claims are granted.

## IV.    CONCLUSION

Defendants Motions to Dismiss are granted in all respects, except as to Plaintiff's claim against Goodkind and Flaster/Greenberg arising under 15 U.S.C. § 1692g, and Plaintiff's claim against Wells Fargo arising under § 1692e(8).


                                        _____/s/ Gerald Austin McHugh
                                        United States District Judge

31